Thank you. Will the clerk please call the next case? Please call the next case. 4-16-0-4-4-0 Mary Shanklin v. Workers' Compensation Comm'n Counsel, you may proceed. Thank you. Good morning. Good morning. My name is Randy Walter. I represent the petitioner Mary Shanklin. The first thing I want to mention is all of the witnesses who testified in this case and the petitioner's testimony and the job descriptions are consistent. She's an interesting lady. She worked prior to this diagnosis of bilateral carpal tunnel for nine years for the city of Springfield during physical labor. Two gentlemen who testified on her behalf stated that it was strenuous, hand-intensive work that she did, although there's a number of different tools, jackhammers and shovels, picks, carrying shingles, moving furniture. So there's all kinds of things that she was doing. But it was that uncontroverted testimony that resulted in Dr. Watson concluding that her job did contribute to her bilateral carpal tunnel and also for Commissioner Devrain to come to that same conclusion on behalf of the commission. Let me ask you a question about the arbitrator's decision. He apparently said that a repetitive trauma injury must be proved with specific and detailed information concerning her work activities, including the frequency, duration, manner of performing. Do you agree with that? Yeah, and I think we've met that burden. But do you agree that that's the standard? Well, let's read it one more time. According to the arbitrator, a repetitive trauma injury must be proved with specific and detailed information concerning her work activities, including the frequency, duration, manner of performing, et cetera. But the respondent did not set any authority. And then we have Edward Hines versus the commission says there is no legal requirement that a certain percentage of the work date be spent on a task in order to support a finding of repetitive trauma. Is there a little bit of an inconsistency? In other words, did the arbitrator impose a higher standard? Well, my answer would be yes. Now that I mentioned it. Well, yeah, no, but I agree because you'll see different ways of handling that issue. And our problem in this case is we don't have an individual who's doing the same job with the same piece of equipment every day. And I've seen cases where that's an issue and others where it isn't. But it would be disingenuous of me to tell my client, look, I want you to testify that you used a sledgehammer 7% of the time and a jackhammer 12% of the time and carried shingles 3% of the time. The activities are just too varied. But I think we meet the burden when all the testimony and the job description and her testimony. But Dr. Watson testified in favor of the claimant. Watson clearly supported the claimant's case, right? Correct. And you had Dr. Kuh on the other side, correct? Yes. Did Dr. Kuh indicate that perhaps the illness could have been a contributing factor too? Dr. Kuh does say, well, she goes beyond that. Her testimony is, for you to read the rest of her testimony, is that diabetes was the cause. Right. And the commission seemed to buy that, right? The commission repeated that line. My response to that is that's not all she said. And I want to make this clear. She says, and these are all ors. Any of these three things, if they occur, she would change her opinion. Not might, but would change her opinion. One was proof that on a daily basis for at least four hours a day she was using her hands in physical labor. Or, forget the two years, but just 75% of the time. Or if she saw a job description that revealed that she was doing hard hand grasping 85% of the time. Well, the testimony meets all three of those. Because for all nine years, the first five years shoveling asphalt out of the truck. But in all nine years, she's using her hands in strenuous physical labor. And this is not just for females. I mean, she's competing with the men on the job and actually is holding her own when there's layoffs to keep her. So she's doing the physical labor that she's required to do. I don't want to, you know, Dr. Kuh spent so much time on the acrylic nail issue that I think she made up her mind. I'm curious about that. She seems to be saying she did not believe Clayman engaged in heavy labor because Clayman had all manufactured fingernails and soft hands. What do we make of that? To me, nothing. Because the testimony was they're acrylic. They're not real. They break off. They pick them up and give them back to her. She'd put them back on or go back to the beauty parlor on the weekend. And she was taking medication to try to keep the calluses off her hands. But aside from that, we can ask the opponent. Isn't she sort of becoming a fact finder? I mean, what? Well, that's why we say I don't – what I say in our brief is we don't think there's any question of facts in this case. We admit she's diabetic. No one disputes she was working 85 to 90 percent of the time in physical labor. And I think what you just said is she's coming to conclusions based on facts. We agree she had acrylic nails, but that doesn't mean she wasn't doing the physical labor because clearly she was. That was her job. It's in her job description. Nevertheless, as you know, we have to manifest way to the standard to overcome. Well, I got a tough argument on that one, but as I say in there, I think we can do it de novo because there is no question of fact in this case. Job description, 85 to 90 percent using her hands in physical labor. The two gentlemen who testified before say the same thing. She says the same thing. We don't deny she's got diabetes. I don't know what the question of fact is. Yeah, but the inferences to be drawn from all of that is not yet undisputed, is it? The impact of the diabetes is not undisputed, is it? I could argue it is. I mean, Dr. Watson, when he was first testifying, he's not an endocrinologist. He's not treating her for diabetes. He forgets that she has diabetes. But when asked questions by both defense counsel and myself later on in this deposition, his answer is even if she has diabetes, not only did her work duties contribute to the carpal tunnel, but it's the main cause based on his treatment of her and her examination and his experience as a local physician. But if we were to conclude it's not de novo, then your argument is? Well, then our argument is we went back 20 years to see if we could find cases like this, and we mentioned them in the brief. And I admit them. I can't remember. Twenty of them are commission decisions that I don't think you're obligated to pay attention to, but we are looking at a commission decision. In all those cases, we didn't edit them. In all those cases, we have people who either weren't doing as much physical labor, not this 85%, 90% of heavy physical labor, and or were not near as long a period of time. Some were just for a few days. And all those people were awarded benefits. And we couldn't find the opposite anywhere. So if it's a manifest weight, we think the score is 32 to nothing. And the response comes back and cites that Williams case, which to me has nothing to do with this. It's a cervical case. You can't pick anything up or twist it with your cervical spine. The treating physicians in that case say it's unrelated, and he contradicts his own testimonies. I just don't see what relevance that case has to this case. The cases we found that have similar facts and not as extreme as this case, we have a female working nine years, heavy physical labor. All were granted benefits for carpal tunnel. This Dr. Kuh. Dr. Kuh was a plastic surgeon, right? I think, yes. It's kind of an odd situation here where you've got a plastic surgeon being brought in to apply it on carpal tunnel syndrome. Did Dr. Kuh set forth what her experience had been in diagnosing and treating carpal tunnel? Not that I recall. I mean, she just basically said that because there's diabetes, I'm going to say that. And she also mentioned obesity, although she's doing that on the BMI. You know, I'm obese. My only consolation is every NFL running back is obese, according to that index. Just a question. We've seen her before. Our question on these third-party doctor's exams is, I don't know how you can be objective when you're paid to render a report. Even if you wanted to be objective, I don't know how you do it. But nobody objected to her testimony, right? Pardon me? Nobody objected to her opinion, to her testimony, right? Well, nobody objected to that. Nobody challenged her right to give an opinion. No. And that's the question. Okay. No. Other than that, you know, in summary, I think that we're just agreeing with Commissioner DeBrink's decision that this was a strenuous, hand-intensive job. It's being done 85 to 90 percent of the time. She's a female. And it was a contributing factor. He recognizes that diabetes may also be a contributing factor, but certainly what she was doing at work all those years. A couple other things. We had Mr. Williams testify for a couple of reasons. One is she was in this business even before the city when she was doing contract labor. And also, to substantiate her testimony, that even when she became a foreman, she was still doing that same percentage of labor, which was critical. Because, again, Dr. Kuh seemed to think that when that happened, her fiscal requirements would lessen. But that was not my client's testimony. It wasn't the testimony of Mr. Williams. Thank you. Thank you, Counsel. You'll have time to reply. Counsel, you may respond. Thank you. May it please the Court, Counsel, my name is Dennis O'Brien. I represent the City of Springfield. I'll address some of the questions that were posed to opposing counsel. Dr. Kuh did set out things that could cause her to change her opinion. She quantified what it would be. They never proved the quantities that she said would be required. So you can't say to her. What are you specifically saying? What were those things? Well, I think it was four hours a day doing things such as troweling or the jackhammering. They never testified to that because she doesn't do those things for four hours a day in all likelihood. Counsel said, well, I didn't counsel her to say 7% of this and 5% of that, et cetera. You need to quantify in some regards. If you say, well, I do jackhammering, is that 1% or 20%? It makes a difference. And yet there was no attempt to quantify at all. She just said, I use my hands at work 85%, 90% of the time. I use my hands at work. I'm doing it now. It's not the same thing. Do you engage in heavy labor at your desk? No, but we're not sure what the heavy labor is on any particular date. She's out shoveling. She talked about the shoveling. She testified they hadn't done the shoveling in the last five years or so. They had gotten a truck that dumped it, et cetera. Well, is there a job description that you agree on as an accurate job description, what she does on a daily basis? There is a job description that was put in that describes all the duties she may do. Okay. But it's not on a daily basis. It's things she could do. As they said, she did shingles, which she would take shingles up onto a roof. She wouldn't necessarily apply the shingles. That's a carpenter's job, but the laborers would take the shingles up. She doesn't do that on a daily basis. She moved furniture. Did she do it on a daily basis? No. She shoveled it 1. Well, how specific do you have to get in that sense? I mean, it seems like every one of those activities in and of themselves. If you did them for four hours or six hours, 75% of the time. But she didn't testify that she did any of them for that amount of time. Can I read to you a statement written by the arbitrator here? It states, Dr. Kuhl opined that Petitioner had such significant diabetes that no matter what occupation she performed, no matter what activity, she would go on to have carpal tunnel and require surgical intervention. Is that an accurate summary of Dr. Kuhl's opinion? It absolutely is. If it is, then it doesn't matter whether or not Petitioner established the frequency of all of these activities. Dr. Kuhl was going to give the opinion that it was the diabetes and not any work-related activity that resulted in carpal tunnel syndrome, it seems. That would be her opinion, yes. No matter what the activity. Well, no, she went on to say that... It says no matter what the activity. Yes, but on further questioning on cross-examination, we find this all the time, where you'll say one thing and then you'll explain it more later. Later on, she did testify, just as he read to you earlier, that if she did these other activities for this amount of time, then that could cause or aggravate a carpal tunnel. She did not sit there and say, under no circumstances could it have anything to do with it. She came on and said, in another portion of her testimony, that if she did these things for four hours, troweling, jackhammering, or two, I remember her testifying to, they could cause or aggravate the carpal tunnel. You seem to be suggesting that she was trying to be more fair in her opinion than candid, but I'm perplexed and somewhat troubled by it. How does she arrive at the conclusion that somebody who can't be engaged in heavy labor because they have well-manufactured nails? She said, among other things about those nails, she said, these were long nails. These were long nails, well past the fingertips. She said you could not hold a shuffle firmly with those kind of nails on. She also said she would find it hard to believe that she could get them into a glove. Now, this is Dr. Kuh. This is Dr. Kuh. And she's a kinesiologist as well as a plastic surgeon. I think she's just a person who, like you and I, have some experience in life putting on gloves and things of this sort. You know, I'm talking about holding a shovel. I think she's, you know, if you are doing something like this, you're making a firm grip around something, she didn't think that you could, that they would get in the way of holding it tightly because they would literally be against your hand. Dr. Kuh, by the way, you asked about the plastic surgeon. Well, you know, I've handled a lot of shovels in my life, and the diameter of the shovel handle will tell you whether or not your fingers meet or not. That's true. Okay. I just didn't know how far afield she becomes an expert. Well, we were questioning about the expert and her being a plastic surgeon. Plastic surgeons do carpal tunnels all the time. SIU School of Medicine, their plastic surgery department is who does their. Interesting. Justice Harris raised the issue. Did the employer dispute the petitioners? Well, did the employer raise the issue whether or not the claimant did shovel work or didn't engage in the activities that she said that she did? In other words, is Dr. Kuh's testimony along the lines of what Justice Hudson just raised, was it relevant to anything that the employer was addressing? Well, she was taking her medical observations on a physical examination, including nopalysis, including hands that were softer than a plastic surgeon's. But just as to whether or not she could have held a shovel, did the employer say that the claimant never did shoveling? No. No, Your Honor, although she said she stopped doing shoveling several years before this occurred. I just heard counsel for the claimant say that she was taking medicine, that there was evidence in the record she was taking medicine for calluses. Was she aware of that, or was there any testimony from Dr. Kuh about that? Dr. Kuh was not advised of that. It was the first I ever heard of it was an arbitration, and she testified to some dermatologist giving her this magic cream that would keep her from having calluses and have these nice soft fingers. And she forgot to bring the cream with her to the arbitration, and no medical records from any dermatologist were introduced. In other words, it was a self-serving comment that blindsided me, and I couldn't disprove. But on the other hand, she had the ability to prove it and didn't. She could have either brought in that magic cream, or she could have brought in medical records from the dermatologist saying, here's what I've prescribed for this purpose, neither of which occurred. And the arbitrator judges credibility. They have an advantage that all reviewing courts don't. They get to see the petitioner. They got to hear her say that. And they got to hear her coworkers, one of whom had retired before she became symptomatic and wasn't there during that period of time to know what she was doing. And we know that the job did change. And she did testify that she did more supervisory work and talked about job assignments and paperwork and things like that. So there was job changes. And the second one, Mr. Williams, he had worked with her on jobs many years before, and he started working with her after she was symptomatic and treated. He wasn't there and seeing what work she was doing before. Neither one of them could testify to what work she was doing before she became symptomatic. So if you were to sum up and tell us, why is the decision of the commission not against the manifest way of the evidence? I would say, first, that she didn't prove what physical work she was doing to an extent that Williams, for instance, would find sufficient. I've got a question here because I'm a little confused on the timeline. They testified as to her work duties and activity after she became symptomatic. Mr. Williams did. Well, yes, because he didn't work for the city when she became symptomatic and was treated. He came on later. He wasn't there while she was... Correct. He came on later. But he had worked with her for other employers more than nine years or whatever earlier, and he knew that she was a hardworking woman back then for those other employers, but he didn't know anything about the work she was doing at the time she became symptomatic. Was she still employed by the employer after she became symptomatic? Yes. She was, and she was a supervisor working foreman, a working foreman. When he worked with her after she was treated for carpal tunnel. So we don't think that his testimony of what she was doing afterwards is really relevant to what caused her condition. And Dr. Kuh's testimony... Because there was a change in work duties between... There may have been. I don't know exactly when he... I know he came on after, and we know that she became a foreman, and she told Dr. Kuh that her work changed somewhat. So there is some change in work duties. She was still a working foreman, but she... She was still laboring. Yes, she was still laboring, yes. But their job had changed also. Some of the work they weren't doing anymore, the shoveling of asphalt, etc. That wasn't the same. And she also said that at certain times they changed the work a lot because they were down to one laborer, and they hired others to come do the work, and she basically supervised it. So work did change periodically, and that's probably true for most jobs. Dr. Kuh's testimony... The woman said that she had the neuropathy. And Dr. Watson, once I pointed out to him his error, admitted that she did have diabetes, and it was so bad she was on oral and injected insulin, and so bad that she had diabetic neuropathy in her feet. But she also had an atonic colon, where an area of her colon, because of diabetes, no longer squeezes and moves the material along, and they had to go in and take out that area of colon. She denied that that was diabetic. Dr. Kuh had those medical records and testified, yes, that's diabetic. So she knows this woman is incredibly... And her diabetes or glucose levels are like three and a half times normal at times. She is out of control, according to her own doctors. She is an out-of-control diabetic. And that's why Dr. Kuh is saying she isn't doing hard physical labor with those hands. Not because of the acrylic fingernails, but because of no calluses. I have calluses on my fingers just from working my paper. So, yes, in some respects, even we have more callus than this woman. Could she really be doing this work? And there's physical evidence that her hands say no. Her hands tell a story. And Dr. Kuh said she's not doing hard physical labor. Others may be doing it for her. When they're doing potholes, she may be holding the flag. You know, the stop sign, et cetera. And others are doing the hard physical labor. She's not doing it. Her hands tell a story. And Dr. Kuh said her diabetes tells a loud story also. And she had already two diabetic problems. And she was taking medication. She was asking you to take medication for your hands. She was taking gabapentin. It's for neuropathy, period. Whether it be in the carpal tunnel or in the feet, it treats the same problem. Manifest weight, we don't think it's de novo. There's obviously a lot of inferences. We don't think it's a de novo case. We think it's a manifest weight case. And we believe that it should be confirmed. Thank you. Thank you, counsel. Counsel, you may reply. Thank you. I think the issue regarding the hands is just a red herring. I mean, we didn't even think about bringing medication because no one has disputed that she was doing this physical labor all these years. I mean, let's look at this. She's other manner laid off before she is. Obviously, she's doing the job. She's promoted to foreman. Obviously, she's doing the job. And the uncontroverted testimony was from her and Mr. Williams, and particularly the job descriptions, is that she was doing this 85% to 90% of the time. The shoveling issue, she's still using shovels on occasion. She still shovels snow. She still shovels asphalt. Well, that was my question to opposing counsel, really. Was Dr. Kuh's opinions, were they running contrary? Were they disputing testimony of the employer's witnesses as to the extent of her physical labor? I don't think she considered them. Because then she says, you know, if you show me that she's doing this four hours a day or if you show me a job description that says she does this 75% of the time, not any particular labor, just physical labor, then I would change my opinion. So she obviously didn't have that there. But the only conclusion you can reach when you look at the job descriptions and the testimony is that those are all things that have happened. And therefore, her opinion would be different. But no one ever questioned that she's doing the work. So to say that she wasn't is pretty offensive because of the condition of her hands. The people she worked with. And it's the city's job description. If she wasn't fulfilling the job description, she wouldn't be laid off last or promoted to foreman. But opposing counsel is saying there's a little problem with specifics there. I mean, that's making an inference that that job description accurately portrays what she does. And he's saying, well, you need more. I think you need to have specifics and percentages. And whatever attempt there was to establish that by the claimant was not sufficient because of the time frame people were talking about what she did when. Right. That's the crux of this, I think. Okay. All right. And if you have to describe 20 different activities that you do at work and what percentage of time you do each, we lose. Because no one was keeping those records. But across the board, job description, testimony of co-employees, testimony of the petitioner, she's doing that kind of labor, strenuous labor with her hands, 85 to 90 percent of the time. I can't tell you if 11 percent is a jackhammer or 30 percent is a jackhammer. But to me, it would be ludicrous to require data that no one's really going to have to decide whether you win or lose. I mean, when we saw, when we heard her testimony and we talked to the people she worked with and then looked at the job descriptions, they're all consistent. And nobody from the city ever said any of those were wrong. So we never even thought we had to get into why she had long nails or fit into a glove or why she's using medication. Nobody disputed she was doing the work. What else? You know, Dr. Watson, obviously at the last half of his deposition after he'd been told about the diabetes, was fully aware of it. In this case or in any other case, I've never seen where the degree of diabetes makes a difference. But our position is once you prove beyond a doubt that a woman is working heavy physical labor with her hands, 85 to 90 percent of the time, for nine plus years, that you've met the burden. And that's what the doctor said, the treating physician said, and that's what the commissioner said. That was enough, and that's our position. The no vote was easier, obviously, but if it's weight of the evidence, what we cited is 32 to nothing. To me, that's a pretty good weight of the evidence. Thank you. Thank you, counsel, both for your arguments in this matter. We'll take them under advisement. A written disposition shall issue.